## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Bianca Ragone, a Special Agent with Homeland Security Investigations, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of a criminal complaint related to violations of Title 8 United States § 1326(a), Reentry of Removed Aliens. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I did not include each and every fact known concerning this investigation. I did not withhold any information or evidence that would negate probable cause. The statements contained in this affidavit are based in part on information and analysis provided by law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas and execution of search warrants; interview(s); and my experience, training and background as a Special Agent. I set forth only the facts that are believed to be necessary to establish probable cause that Carlos GARCIA CARRILLO committed the violations listed above.

2. I am a Special Agent of Homeland Security Investigations (HSI), also known as Immigration and Customs Enforcement (ICE), assigned to the Office of the Assistant Special Agent in Charge, Columbus, Ohio, since September 2019. During my tenure as a Special Agent, I have completed the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I received training that included drug and human smuggling, immigration, and other violations of federal law. I am currently based out of the Guernsey County Sheriff's Office (GCSO), and I am responsible for enforcing federal law in the Southern District of Ohio. Moreover, I am a federal law enforcement officer who is responsible for enforcing federal criminal laws, including violations of 8 U.S.C § 1326 and 8 U.S.C. § 1324(a)(1)(A)(ii), and I am authorized by law to request a criminal complaint.

## FACTS SUPPORTING PROBABLE CAUSE

3. On April 2, 2025, the Ohio State Highway Patrol (OSHP) received a Be On The Lookout ("BOLO") alert from United States Border Patrol (BP) for a White Ford Explorer bearing Arizona license plate E8A44X (the "Vehicle"), which was possibly smuggling humans and/or narcotics through Ohio. At approximately 9:44 a.m., OSHP located the Vehicle, witnessed it committing a lane violation, and conducted a traffic stop on I-70 east near mile marker 178 in Cambridge, Ohio.

4. I was called to the above-mentioned traffic stop, where I met with OSHP Trooper (Trp.) Seth Jones. Trp. Jones stated the driver, who initially identified himself as "Ezequeil Neir" but was later identified as Zenaido Neri Perez, claimed he was "in charge." Neri Perez did not speak English and presented Mexican identification utilizing the "Neir" alias. The front seat passenger, Juan Jacobo Ortega Guevara, presented a California driver's license, spoke some English, and had a large bundle of U.S. Currency on his person totaling approximately $3,000.

5. OSHP Trp. Tysinger deployed his narcotics canine around the above-mentioned vehicle simultaneous to Trp. Jones conducting his normal traffic stop duties. A positive indication was given by the canine to the presence of the odor of narcotics. A probable cause search of the vehicle was conducted by OSHP. No narcotics were located in the vehicle, though items consistent with trafficking were found, such as Santa Muerte figures and multiple cellphones. Santa Muerte, which is frequently depicted as a grim reaper, is often utilized by traffickers to symbolize safe passage and protection. It is also common for traffickers of both people and drugs to have more than one cellphone.

6. The other occupants of the Vehicle were identified as Merlin Ismael Garcia Soto, Ana Carmen Flores Garcia, Jose Choc Yat, Jose Luis Roman Avilez, and Carlos GARCIA CARRILLO.

7. I contacted the ICE Law Enforcement Support Center, which provides real-time assistance to law enforcement on matters including undocumented aliens (UDAs)

suspected of criminal activity and obtained the following information. Ortega Guevara had illegally entered the United States from Mexico twice in 2006 and was allowed a voluntary return both times. He did not have an alien number, and he had been charged with felony domestic violence, though the charge was dismissed.

8. I spoke to BP Agents Tyler Adkins and Brian Bitter regarding their ongoing investigation into a criminal organization with which the Vehicle was connected, as the BOLO had noted. I was advised of the following information.

   a. They had conducted 20-30 search warrants in the last few months resulting in six figures of bulk cash seized, 150 pounds of methamphetamines seized, 2 pounds of cocaine seized, 50 kilograms of fentanyl seized. Their investigation had secured over 70 criminal convictions and led to many deportations, and it had uncovered millions of dollars being moved from the United States to Mexico related to human smuggling and drug trafficking crimes.

   b. Additionally, Ortega Guevara was a known "caretaker" of a stash house[1] in Phoenix, Arizona. The stash house was for both humans and narcotics.

   c. The Vehicle had been seen at four related stash houses and had recently completed a cross-country round trip ending in Phoenix, Arizona.

   d. Based upon previous interviews and information obtained from cellphone extractions, it was known to BP that new UDAs were picked up in the Vehicle and were enroute to their drop off location(s) when it was pulled over in Ohio. License plate reader results on the Vehicle showed constant cross-country trips consistent with human smuggling/transportation of UDAs.

   e. For border crossings, this specific smuggling organization usually would guide UDAs through the desert via phone calls and text messages. Once the UDA was on the United States side their phone would be taken (sometimes destroyed). The

---

[1] A stash house is a building, trailer, or house where weapons, drugs, illegal aliens, or illegal items are hidden or stored. These so-called stash houses are used by alien smuggling syndicates as well as other organized criminal groups.

person meeting the UDA from the organization wore a ski mask and would usually take the UDA to a nearby apartment that was operated as a stash house. Common pick-up spots by the drivers of the organization were Walmart and Home Depot parking lots.

9. All seven occupants were asked basic alienage questions. Specifically, each was asked place of birth, place of parents' birth, date and manner of crossing into the United States, and if he/she had any papers to pass through or remain in the United States. None of the occupants had lawful status to pass through or remain in the United States. All seven occupants were taken into custody for further processing at the HSI/ICE office located in Westerville, Ohio.

## INTERVIEWS

10. On April 2, 2025, HSI Special Agent (SA) Paul Mills and I interviewed Ortega Guevara with a Spanish interpreter via telephone. Ortega Guevara was read his *Miranda* rights, waived them in writing, agreed to speak with investigators, and stated the following.

    a. The Vehicle belonged to a friend named Alejandro. Ortega Guevara had worked for a criminal organization for approximately 3-4 months transporting illegal aliens around the United States. Friends of his who worked for the organization initially connected him to it; most of those friends had recently been deported.

    b. To initiate a cross-country trip transporting UDAs, a Mexican number would call and/or text him an address to meet the UDAs.

    c. On this particular trip, he picked up all UDAs on or about March 31, 2025, in a Walmart parking lot in Phoenix, Arizona. Family members of each UDA paid him approximately $150-200 for the trip. His gas and expenses were paid by the organization, and the $150-200 per person was his cut to keep. He knew all individuals in the vehicle stopped in Ohio were illegally present in the United States. He initially started driving but then got tired and switched with Neri Perez. He stated that he and Neri Perez were just friends, and that Neri Perez did not

  work for the criminal organization. He was supposed to drop everyone off in Pennsylvania. They made one stop along the way for gas and he paid.

  d. He had completed three trips while working for this organization and made approximately $3,000 in total.

11. On April 2, 2025, HSI SA Paul Mills and I interviewed GARCIA CARRILLO in English. GARCIA CARRILLO was read his *Miranda* rights, waived them in writing, agreed to speak with investigators, and stated the following.

  a. He crossed illegally into the United States in approximately January of 2025. He paid approximately $2,000 and crossed with one or two other people. He was provided instructions on the specifics of crossing the border via telephone. He was arrested by immigration and deported to Mexico. He crossed illegally into the United States again in approximately February of 2025. He did not pay anything for that crossing since he was arrested and deported in January.

  b. Once he reached the United States side, someone unknown to him picked him up. His cellphone was taken from him, and he was then taken to a house for a few hours. He was picked up from that house and brought to a mall area. The Vehicle was there to pick all passengers up and was driven by Ortega Guevara.

  c. Ortega Guevara initially started the drive but then switched with Neri Perez. Ortega Guevara and Neri Perez appeared to be friends and know one another. He stated he was heading to New York. No one was picked up or dropped off during their journey, but some people in the vehicle were heading to Pennsylvania. The only stops they made on their journey were for gas.

### CRIMINAL & IMMIGRATION HISTORY

12. A search of immigration databases and a criminal history search revealed the following information related to GARCIA CARRILLO.

  a. On or about August 12, 2009, GARCIA CARRILLO was arrested in New York by Suffolk Police Department for Operating a Motor Vehicle With .08 of 1% Alcohol

or More in Blood (1192 SUB 02). On or about September 23, 2009, GARCIA CARRILLO pleaded guilty. On or about November 19, 2009, GARCIA CARRILLO was convicted of the above offense and was sentenced to probation with a $500 fine.

b. On or about January 17, 2025, Customs and Border Protection (CBP) apprehended GARCIA CARRILLO near Bisbee, AZ. He was charged with 212(a)(7)(A)(i)(I), of the Immigration and Nationality Act, Immigrant Without an Immigrant Visa, and released and/or detained as a material witness. On or about February 7, 2025, GARCIA CARRILLO was removed from the United States and deported to Mexico.

c. On or about March 2, 2025, CBP apprehended GARCIA CARRILLO near Lordsburg, NM. He was charged with 212(a)(9)(A)(ii), of the Immigration and Nationality Act, Alien Previously Removed Once Not As An Arriving Alien. On or about March 5, 2025, GARCIA CARRILLO was removed from the United States and deported to Mexico.

d. I also reviewed DHS Indices that track lawful entries into the United States. Those indices indicated that GARCIA CARRILLO had not lawfully entered the United States, nor had he applied for nor obtained permission from the Attorney General of the United States, or her designated successor, or the Secretary of Homeland Security, to re-enter the United States legally since his last removal.

## CONCLUSION

13. Based on these facts, there is probable cause to believe that GARCIA CARRILLO, an alien, after having been previously removed from the United States, did knowingly and unlawfully enter and was found in Cambridge, OH without obtaining the express consent of either the Attorney General or the Secretary of the Department of Homeland Security to reenter the United States, in violation of 8 U.S.C. § 1326(a).

Respectfully submitted,

*Bianca Ragone*

Bianca Ragone
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me this 17th day of April 2025.

_____
Chelsey Vascura
United States Magistrate Judge
U.S. District Court for the Southern District of Ohio